Thank you, Your Honor, and may it please the Court, D'Ann Maynard on behalf of Cintas, I'd like to reserve four minutes for rebuttal. The express language of the parties' agreement requires arbitration of this dispute. I'd like to start with the three provisions that compel that conclusion. First, the Participating Public Agencies provision on ER 79 binds Laurel to all terms and conditions of the Master Agreement. Second, the Master Agreement provides in Section H on ER 78 that all disputes shall be resolved pursuant to the stipulations in the Request for Proposal. And third, the Request for Proposal's Disputes provision, which is at ER 100, requires that all disputes between the parties will be resolved by a single arbitrator. Well, hold on, Counsel. In the Request for Proposal, you have a section that specifically indicates an arbitration agreement, correct? Yes, Your Honor. When you get to the piggyback agreements, the facility solutions agreements with the individual public agencies, that doesn't have also a specific arbitration clause when discussing disputes. In fact, it indicates that all disputes between the Participating Public Agencies and suppliers will be resolved directly between them in accordance with the governing law of that state, et cetera. So why should we sort of interpret that, nope, there's an arbitration provision here, even though it doesn't say that? Because the default provision in this contract, Your Honor, is that Laurel is bound to all terms and conditions of the Master Agreement. So the Participating Public Agencies provision, which has the sentence to which you refer, as well as Laurel's piggyback agreement, that provision also provides Laurel is bound by all terms and conditions of the Master Agreement. So the fact that the Participating Public Agencies agreement is silent about arbitration, in other words, there's no, the district court's error is that the district court thought the absence of mention of arbitration in the Participating Public Agencies provision meant that the arbitration provision was displaced. But the contract provides the opposite rule, which is that Laurel is bound by all terms and conditions. Well, Ms. Boehner, can I follow up with that? Because they can't be bound by all of them since there are some certain specific things that would apply to the participating agencies, you know, their own billing, different ordering, scheduling, there's, you know, invoicing. So there are, you would recognize that there are some differences between the Master Agreement and their own particular agreement with CINTAS that wouldn't be exactly the same, correct? Yes, Your Honor. But the contract, when it means to apply only specifically to Hartford, the lead agency, it says so. So this is my follow-up. So the RFP has a dispute resolution provision with two paragraphs. The first paragraph, as I read it, seems very clearly associated with Hartford. It talks about any claims, disputes, or other matters in question shall be referred to the Hartford County Public Schools Supervisor of Purchasing, and that supervisor has to make decisions about whether to, how to decide those issues. And then the second paragraph, which contains the arbitration sentence, also has things that seem very specific to just Hartford. You know, that the governing law is the State of Maryland, that all process has to be in writing and submitted to the Supervisor of Purchasing. None of those things apply to other participating agencies. So my question is, aren't you asking us to rewrite the terms of the dispute resolution provision? Because we can't just lift it wholesale and apply it to a different contract. No, I'm not, Your Honor, and I'd like to sort of make two points in response to that. One is, many of the provisions in the Master Agreement refer to Hartford when they also apply to participating public agencies. Take the pricing provision, which is the basis of the breach of contract claim here. That's on ER 77, Section C, Compensation. It starts out, H-C-P-S shall pay, and sentence shall supply. So H-C-P-S being Hartford County Public Schools. But, of course, Laurel believes it's bound to that provision, and that's the basis for the suit here. To your question about the fact that- Can I follow up with that? Yes, Your Honor. But the 2017 agreement has a separate carve-out that's specific to those different participating agencies, that they are going to handle their own-let me see if I can find the language. I think you're referring to ER 199, the Laurel facilities- I think so. In essence, it's a statement that says that the participating agencies will be exclusively responsible for dealing directly with CINTAS as to billing and invoicing and other things. So there is a particular carve-out where it says, okay, as to these matters, it's not the master agreement that's controlling. It's this one. But dispute resolution, it's just, you know, it seems as if you're asking us to lift out of that and apply it. And so that's the trouble that I'm having with your argument. But the significant point here, Your Honor, is there is no carve-out for the arbitration provision. So if looking at the two provisions, one, the participating public agencies provision, the sentence that the district court relied on is the last sentence, which it's a similar language in both the piggyback agreement as well as in the master agreement. And so on ER 79, which is what the district court was looking at, any disputes between a participating public agency and supplier will be resolved directly between them, and the district court emphasized that language. But nothing about that language precludes arbitration. Of course, the parties can resolve their disputes directly between them, so without Harford, in arbitration, in court, out of court. So that doesn't displace the arbitration agreement. And second, in accordance with and governed by the laws of the state in which the participating public agency exists, even assuming that the entire dispute will be resolved according to Mississippi law, nothing about that choice of law provision prevents the arbitrator from applying that choice of law. So it doesn't conflict. But, counsel, with regards to your previous point, though, you mentioned that they have to deal with each other with regards to pricing and the like. The previous sentence to the one that you just read talks specifically about that when dealing with specific public agencies, which indicate that each participating public agency will be exclusively responsible to deal directly with the supplier on matters relating to ordering, delivery, inspection, accepting, and invoicing. So I guess I'm not understanding your argument. Well, because the sentence before the one you read, Your Honor, is the one that says Laurel is bound by all terms and conditions of the master agreement. And so the two sentences that follow are exceptions to that, but nothing in either of those sentences accepts them from the arbitration requirement. So if I could explain how the disputes provision in the request for a proposal works, and it harmonizes all of the provisions in the contract. So that provision is on ER 100, and it starts out, except as provided in these, otherwise provided in these contractual documents. So things like the first paragraph, Your Honor, that deals specifically with the supervisor of purchasing in Harvard, well, obviously the provision that says CENTAS will resolve that directly with a participating public entity like Laurel, that displaces all the provisions in L that appear to be anonymous, not anomalous when applied to Laurel. Doesn't it appear, though, that you're just picking and choosing which provisions, specifically here the arbitration agreement that you want to apply to the PPAs and not other provisions that you're not comfortable with because it doesn't make sense to apply them? No, Your Honor, that's how the contract works. And I think in the context here where U.S. communities, which is pulling together the purchasing power of entities across the nation and had Harvard draft this request for proposal provision that has an arbitration clause and included in the request for proposal that if CENTAS were to win the bid, the request for proposal provisions would be in any master agreement. The master agreement so provides in Section H arbitration. And so there are two provisions within Section H governing law, which is on ER-78. But again, you know, Section H says, Governing law of this contract shall be interpreted and governed by the laws of the state of Maryland. I think you mentioned to me or in agreement that that would not apply to participating agencies. So at least that first sentence of governing H seems to be inapplicable. So if we get to the second one, disputes will be settled as per the stipulations contained within the request for proposal. And we get back to a request for proposal that seems very specific to Hartford once again. So to my colleague Judge Mendoza's point, it seems as if you're either picking and choosing or asking us to pick and choose which clauses to lift in order to say that this should be arbitrated. No, Your Honor. So both the laws of Maryland and Mississippi contract law require this court to harmonize all the provisions and have all of them apply unless they conflict. And the contract Well, so are you saying that the participating 2017 contract was governed by the laws of Maryland? So the way that we read the conflict of laws provisions, Your Honor, to work, although it doesn't matter for the answer to the arbitration question, is that the language you just read from Section H in the master agreement, the interpretation of the master agreement is governed by Maryland law. And that makes sense in the context of this nationwide procurement, that the master agreement have a meaning the same regardless of where the participating public agency exists. But any dispute between a particular participating public agency would be governed by the law where that entity exists. And that also makes sense. Even though the same master agreement also says any disputes between the PPA and the supplier will be resolved directly between them in accordance and governed by the laws of the state where the PPA exists. Well, I think the dispute, Your Honor, could be governed by the laws of the participating public agency with the exception of the interpretation of the agreement. So things like fraud and the inducement or other defenses. But even if you don't agree with that, that doesn't change the answer to the question that the arbitration provision is separate. So Laurel agrees on page 15 of the brief that there are two separate requirements in Section H, a choice of law and a dispute resolutions procedure. And that dispute resolutions procedure On what section were you saying? So it's Section H. It's on ERCPA. It's the governing law. So there's two separate sentences. And Your Honor pointed this out. And the Supreme Court has had cases like this where there's two separate provisions. And they've interpreted it distinctly. The one is the choice of law. That may be displaced. If you think that all of Mississippi law governs this whole dispute, that doesn't change anything about the arbitration requirement because that doesn't displace the second sentence, which they recognize on page 15 of their brief is a separate requirement. It requires arbitration. And if L also, we're not asking you to pick and choose in the disputes provision from the request for proposal on ER-100. We're actually asking you to apply the contract as written. So it says Can I just ask, what on your reading, what is the resolved directly between them phrase actually doing? Because I think you said, you know, we wouldn't apply the provisions that are specific to Hartford that would be anomalous with respect to a different agency. And obviously no one would expect that in a contract with some other agency that you would involve Hartford in the resolution of that. So is that language just superfluous in your view? No, Your Honor. That language makes clear. That language gives effectuation to the except as otherwise provided in these contractual documents on ER-100. So that's the lead-in to you must present your claim to the Hartford supervisor of purchasing. So you don't have to do that when you're, and that makes perfect sense, when you're a Laurel or another participating public agency. If you have a dispute with Centos, you don't have to go through Hartford's supervisor of purchasing. But nothing in the contract provides otherwise to the arbitration provision, which doesn't use Hartford. The arbitration provision, which is on the bottom of ER-100, refers to the parties will participate in alternative dispute resolution. And it's the lead-in to the arbitration requirement. Nothing about that provision, Your Honor. And it's not redlining. It's the way this agreement works. So, for example, in the notification provision, which they don't dispute parts of that would apply to them, that's on ER-78. It gives the address for the supervisor of purchasing of Hartford. It also gives the address where you send notifications for Centos. Well, that part still applies. And the paragraph that's under that, which talks about how, you know, how things can be waived or not, terms and conditions, that's part of the all terms and conditions to which Laurel agreed when they agreed to this contract. That's the default rule that applies, and unless neither of the other sentences, none of the other sentences in the participating public agency's provision displaces the arbitration requirement. If the Court's in any doubt about this, it should enforce arbitration given the federal policy in the FAA in favor of arbitration. We don't think there's any doubt. We think the best way to reconcile all these provisions is to award arbitration. If I may, I'd like to save the balance of my time. You may. Thank you. Mr. Burtons. Good morning, Your Honor, and happy Valentine's Day, actually. But putting that aside, the central issue before this Court is whether the city of Laurel in Mississippi should be bound to an arbitration clause found in a contract to which it was not expressly a party and which on the face of the actual agreement that the city of Laurel signed with Centos was not expressly incorporated. Well, the actual agreement, though, did say that they would apply the same terms and covenants agreed to under the master agreement, which has the arbitration clause. So why? I mean, that does seem like an express incorporation of at least something, right? It's actually what I refer to as the terms and conditions fallacy here. And essentially this is an argument that's drawn from cases, including century indemnity, on which Centos relies. But the threshold question in those cases is whether there was an incorporation of all terms and conditions, as we just heard from Centos' counsel, into an agreement between the parties that are in the dispute here, the city of Laurel and Centos. So I'll refer the Court to ER 199, Section 1. This is in the city of Laurel FSA. So the actual language of this provides that the supplier, Centos, agrees to extend the same terms and covenants, or terms, comma, covenants, agreed to under the master agreement to other government agencies, like the city of Laurel. And here's the operative language. That in their discretion, desire to access the master agreement in accordance with all terms and conditions contained herein or attached hereto. This document does not say therein or attached thereto. The reference here is not to all terms and conditions in the MA, or the master agreement, but the natural reading of this language is that it's to all terms and conditions that follow after this general provision. Well, maybe the second reference to terms and conditions is, but the first reference to terms and conditions is that they're extending the terms and conditions, or the terms and covenants agreed to under the master agreement, right? So doesn't that incorporate what's in the master agreement? Correct, Your Honor. So the distinction I'm drawing here, and I just want to be clear, okay, because there is a reference to the master agreement in this agreement that Centos actually signed. But the premise of all of the arguments that Centos makes is that every single provision in the master agreement was somehow incorporated by reference into the FSA, which is the only agreement that Centos and the city of Laurel actually signed. This is the agreement that the city of Laurel bound itself to. Now, clearly there is a reference to the master agreement, and we have not disputed that there are elements of the master agreement that the parties have conducted themselves in accordance with. But the threshold questions for their argument is whether there has been a, if you will, gross incorporation of all terms and conditions, and that's just simply not what the FSA says. And what is it about that sentence that doesn't say that? So two things. So the first part of the sentence is that the supplier agrees. Okay, the supplier in this case is Centos, and Laurel can't control what Centos is agreeing to. Centos in this provision agreed to extend the same terms and covenants. Note there is a difference there in the terminology used between the master agreement and the FSA. It's not terms, conditions, covenants. It's just terms, comma, covenants. So Centos has agreed to provide those same terms and covenants under the master agreement with the lead public agency, which was Harvard. Okay, that's, again, not City of Laurel. But then we get to the next clause in the sentence that refers to what City of Laurel is doing. And so City of Laurel, quote, in their discretion, in its discretion, desires to access the master agreements in accordance with all terms and conditions contained herein and or attached herein. Right, right, right. But what they're doing, I mean, it's in accordance with the conditions here in the specific agreement. But what they're doing in accordance with those terms is accessing the master agreement. And I don't understand what that would mean if not getting the terms of the master agreement, except to the extent that they're inconsistent with the more specific one. So what it means, and, Your Honor, there's no dispute between the parties as to the inquiry that this court reviewing this case de novo or the district court was to apply in looking to see whether there was an enforceable arbitration clause. And the first step in that arbitration two-step is to determine whether there's an agreement. So when you look to see whether there's an agreement and what the terms of that agreement are, you naturally have to start with the text. My point here is that the cases on which Centos relies all start with an agreement that contains a clause to the effect, and this is found on page 50 in the Century Indemnity Decision, that essentially says all terms and conditions of the whatever agreement is incorporated shall be applied to this agreement as if contained herein. There's no such language. So the first step in looking to determine whether there is an agreement is to start with the language in the FSA, which is the actual agreement signed between the parties in this case. And there's no global incorporation in the FSA. So your view is beyond referencing the master agreement, there needs to be something more explicit to incorporate the arbitration provision itself. That's generally what you see. And how would you respond to Ms. Maynard's argument or point that in the RFP that there is a sentence that very specifically says that these claims will be arbitrated? Sure. Sure, Your Honor. So it brings me actually to my second point, which is basically to invoke Occam's razor, if you will. And the right solution or right interpretation this court should apply and the district court did apply is the interpretation that follows the fewest assumptions. So ultimately, we started with the FSA where we should start, the actual agreement between these two parties. We've been over several of those provisions in the master agreement. What the district court did was attempt under Mississippi law, which should apply here, to harmonize this global set of documents. So the FSA, the master agreement, and the RFP. So how do you harmonize that given the distinctions that this court has brought out with counsel with respect to the disputes provision of the section K of the master agreement? The way to harmonize that is to look at the RFP for what it is. We've heard counsel speak about that. It was a process designed to request bids for this work. And so you look at that, you look at the dispute section, section L. The first paragraph is pretty clearly limited to the context of the bidding itself. So these are, they follow model code, but these are basically provisions that deal with contesting the bidding process. Counsel, in section K of the master agreement, it says disputes will be settled as per the stipulations contained within the request for proposal. And it has an arbitration agreement. That's her point, that it says that and that you presumably agree to that. So it does say that, Your Honor, but that's not where section K stops. So section K, and bear in mind the master agreement. Well, that was section H, right? I'm sorry, Your Honor. Of the master agreement. Well, and perhaps I misheard what the court was quoting. Your question, I'm sorry, Your Honor, was to point to. Sure. In section H of the master agreement, it says disputes will be settled as per the stipulations contained within the request for proposal. That's correct. In the request for proposal, there's an arbitration agreement where disputes are going to be settled. So her point is why shouldn't that just apply? Sure. And, Your Honor, it comes down to the overall framework that we were just discussing. So the parties to the actual master agreement in the first instance and how it is drafted are not the city of Laurel and Centos. They are Harford and Centos. Okay? So the idea coming out of that bidding process was the RFP would lead to a contract. In fact, the contract is capitalized in the second provision of its section L dispute provision that the parties would ultimately agree, and that's ER 100, parties would ultimately agree to a contract. The parties, Harford and Centos, did. That's the master agreement. And you're right on ER 78. We have the governing law provision that provides that the law that will apply is Maryland. Harford was a Maryland entity. And that disputes will be settled by the stipulations in the request for proposal. All of that makes sense because these are the actual parties to the master agreement in its first instance. They've agreed to stipulations in the RFP that are largely geared towards that bidding process, but ultimately that is not where the master agreement ends on this topic. So it has to be read in conjunction with Section K. And the last sentence of Section K really covers disputes by anyone who joins later, the participating public agencies. Mr. Wilson, let me ask this. I'm not quite getting the logic of having a master agreement in which others would piggyback onto, presumably for favorable terms like pricing and other things, just something standardized, but only limit arbitration to just the master agreement. Why? That's a pretty important provision. Why wouldn't the piggybacking contracts also want to have an arbitration clause as well? Sure, Your Honor. I mean, ultimately that's a question for the parties when they're drafting the agreement. And the simple answer is that when Harford and Centos negotiated the terms of the RFP for how they were going to conduct themselves, that's what they negotiated. They negotiated a non-binding arbitration process that would require someone to go into arbitration first and then make an attempt to resolve the dispute there. That's what they agreed to. But as the district court determined, and I think is reflected fairly in the documents, is that Harford was making no attempt to settle disputes for any other entity. There were no other entities of party at the time with any agreement with Centos. And so Harford left the issue of disputes with other parties to another day and other contractual negotiations. And these other parties can decide whether they want arbitrary disputes or litigate them? Is that your point? That's correct. And so this 2017 contract leaves it open to the parties specifically to decide between Centos and Laurel, do we want to arbitrate this or do we want to resolve it in some other way? Ultimately, that's the import of Section K, is that disputes between the PPAs and Centos will be resolved directly with them in accordance with the law of the state that they're in. It's a punt. It says, look, you go figure out what, this is what the district court held. When you have these subsequent negotiations, you figure out whatever other terms you're going to include with them and you can abide by those terms. Why, though, isn't it a better reading if we're trying to harmonize the two and give effect to everything that we can to say that the directly between them clause, you know, displaces the parts that refer to Hartford, right? Because obviously Hartford isn't going to be involved in a dispute between, you know, the city of Mississippi and the company. So, you know, we can't give effect to the Hartford parts, but we can still give effect to the part that refers to arbitration because that's just about how, that could be about how any two parties resolve a dispute. So it would be consistent with both, with the language in both agreements to say it will be resolved directly between them by arbitration. Why isn't that a better reading? It comes back to the thresholding part. The court has to determine whether an agreement exists, so it looks to the language of the agreement. The problem with Sentosa's argument and reading Section L of the RFP that way is that it is asking the court to look at the text and then say, okay, I'm going to assume that Paragraph 1 doesn't apply, even though there's a provision that we just referred to in the master agreement, Section H of the master agreement, that says dispute resolution is handled by Section L in the dispute section of the RFP. So the contract says we're going to handle that in Section L. So then the court has to say. But we don't have to assume that 1 doesn't apply because the first paragraph, well, for one thing it says except as otherwise provided, and for another applying it would be inconsistent with the directly between the parties language. So we're not assuming it doesn't apply. It would be displaced by the more specific provision. But you're on the one hand there saying, and really functionally, there's nothing to guide the court in this inquiry,  but we've got this separate dispute provision in Section K that displaces at least parts of Section L of the RFP, but not all parts. So then we have to go in and determine which parts. So, okay, the first paragraph of Section L, you look at it, you say, well, this references Hartford County Public Schools, so we're going to assume that that doesn't apply across the board. But what do you do with the second provision? What is the rational rule that's going to guide you in that, in terms of the text and intent of the parties? Because ultimately that is what the court is trying to divine here, is what the parties intended. And my point to the court, and the whole Occam's razor point, is that if you have to make multiple assumptions or decisions about what does and doesn't apply in the context of a provision that the master agreement says handles disputes, how can it be clear that there was an agreement reached between my client, the city of Laurel, and Centos in this regard? Does Mississippi law have a rule of ambiguity against the drafter of a contract? It does, although no determination on that issue was made by the district court. So ultimately if this court were to determine that that determination needed to be made, I think it would have to be remanded for that purpose. Thank you. Thank you, Your Honors. Maynard? I'd like to make three quick points, if I could, Your Honor. First, this is the first I've heard that they're arguing they're not bound by all the terms and conditions pursuant to the words of both the agreement they signed and the master agreement. They, of course, are relying on the pricing provisions and other provisions in the master agreement for the suit itself. What he's saying, I think, is with regards to the FSA, that in the participating public agency section, since it's a supplier agrees, it doesn't say that the PPAs agree to those things. I think that's what his point was, right? It says that they're desiring to access the master agreement in accordance with all terms and conditions contained herein. And that binds both parties. I mean, to take a step back, they're trying to piggyback on the agreement that was negotiated by Harford, the RFP that Harford issued with the U.S. communities. And, Your Honor, if contra preferendum applies here, it should apply not against CENTAS because the RFP was not drafted by CENTAS. The RFP was drafted by a party with bargaining power. But I don't think the language is ambiguous, so I don't think you get there. But you couldn't take it against us. But they are piggybacking, Your Honor, on the benefits and any burdens they perceive in the contract by taking all terms and conditions. And the only ones that don't apply are the ones that expressly say that. And I'd also say, Your Honor, to one of the questions you asked me earlier, like in several places in the agreement, Harford was looking ahead and saying Harford-specific only. This is Harford-specific only. So I would point the court to ER-99, the insurance provisions. These are only specific to purchases made to HCPS. The ER-101, billing and payment specific to HCPS, and it says specific to other entities. And then there are two attachments, attachment G at ER-179 and attachment H at ER-186, specific only to Harford County Public Schools. They agreed to binding arbitration under the AAA rules, and this court should reverse the district court and order a stay for arbitration. Thank you. Thank you very much. We thank both counsel for their helpful arguments this morning, and the case is submitted.
judges: MILLER, SANCHEZ, UNKNOWN